[Civ. No. 24404.   Second Dist., Div. Three.   Apr. 7, 1961.]

HUGH C. IREY, Respondent, v. SAM LEN et al., Appellants.

Gordon Stater and Fain & Lavine for Appellants.

George E. Danielson for Respondent.

SHINN, P. J.—This litigation arose out of a controversy between plaintiff Hugh C. Irey and defendants Len Construction Company, Inc., a corporation, and Sam Len, with respect to an interest to which plaintiff was entitled in the proceeds of a joint venture.

Plaintiff was a certified public accountant actively engaged in business and well known to defendant Len, who was licensed in California as a building contractor. Len Construction Company was a corporation which had issued but 500 shares of its capital stock, all of it to Sam Len; the corporation had been organized to do construction work but had not yet engaged in business; the court found that Sam Len was, in fact, Len Construction Company as the sole owner, president and manager; Len and the corporation were not separate entities. They had submitted a bid upon a construction project for the Navy at its base on the Island of Oahu. They did not have the capital that would be required in execution of the contract if it should be awarded to them. Len approached Irey for the purpose of obtaining his services as called for from time to time as an officer of a corporation

intended to be formed for the purposes of the particular enterprise. A letter agreement was entered into which reads as follows:

"May 17, 1951

"Mr. Hugh C. Irey
6425 Hollywood Boulevard
Hollywood, California

In Re: Naval Station—Barber's Point
Title VIII, Navy Title VIII Project N-40
F. H. A. Project Number 140-80001-Navy-1

Oahu, Hawaii

"Dear Mr. Irey:

"In connection with the construction of the above proposed project, this is to advise that for your services as an officer of the company, which will construct this project, we will compensate you as follows:

"(1) We will issue to you 10% of the capital stock of the corporation in the event it becomes necessary for us to relinquish as much as 30% interest in the capital stock of the corporation in obtaining, from any source, the necessary 'front money.'

"(2) In the event it becomes necessary for us to relinquish more than 30% of the capital stock in order to obtain the necessary 'front money,' we will issue to you 5% of the capital stock of the corporation.

"(3) You will be entitled to no salary, but will be reimbursed for any travel expenses on corporation business.

"It is understood and agreed that it will not be necessary for you to devote full time to the affairs of the corporation, but that you may be called upon from time to time for consultation and advice in connection with finances and other administrative matters. It will be unnecessary for you to discontinue the operation of your Hollywood office.

"You may indicate your approval of this agreement in the space provided below.

Very truly yours,
LEN CONSTRUCTION COMPANY
BY /s/ SAM LEN
Sam Len President

Approved 5/17/51
/s/ HUGH C. IREY"

Len found a backer for the project in Richard S. Diller who agreed to furnish up to $250,000 in exchange for a 50 per cent interest in the project. It was then discovered by Len and Diller that under the Wherry Act (63 U.S.Stat. 570 et seq. [1949 C-403]), pursuant to which housing facilities at the base would be constructed, it would be necessary to have two corporations, one of which would be the owner of the project and the other the builder under a construction contract. The bid that was submitted was accepted. Diller furnished the money as agreed. Accordingly, Len caused to be organized a Nevada corporation, Coral Rose Manor Company, which was to be the owner, and another corporation, Diller-Len Construction Company, which was to contract with Coral Rose for construction of the work. The government leased the land to Richard S. Diller and Sam Len for 75 years for $1.00. The lease was at once transferred to Coral Rose, which then borrowed $2,878,200, and the loan was insured by Federal Housing Administration. Coral Rose and Diller-Len entered into a contract for construction of the improvement. In this contract the parties were reversed. It was provided that Diller-Len was the owner of the project and that Coral Rose as contractor would do the construction work. This obvious mistake appears to have been overlooked by the parties and Coral Rose continued as owner and Diller-Len as contractor. The contract price was $2,811,480 cash plus a fee of not to exceed $224,911 which was to be paid in Class B preferred stock (no corporation named) at $100 per share. Diller-Len undertook the work and completed it. In the meantime the government had contracted with Coral Rose to provide certain utilities, the agreement reciting that Coral Rose "had constructed or would construct" the improvement.

By agreement of the two corporations, Diller-Len was paid $15,000 in cash and stock in Coral Rose was issued to persons and in amounts as follows:

| | |
|---|---|
| Sam Len | 470 shares |
| Diller | 235 shares |
| Others: | 295 shares |

Certain sums of money were distributed to the stockholders of Coral Rose.

Inasmuch as the advancement by Diller exceeded 30 per cent of the contract price, Irey's interest in the entire project was limited to 5 per cent.

Plaintiff was awarded a judgment which directs Len to transfer to him 50 shares of the common capital stock of Coral Rose, and also awards him 5 per cent of various sums which Len had received from the corporation as distributions of cash to its stockholders.

The decisive question in the case is whether plaintiff was entitled to a 5 per cent interest in Diller-Len Construction Company or 5 per cent of the stock of Coral Rose, plus the same percentage of sums paid Len as a stockholder.

Defendants contend that the agreement clearly provides that Irey was to have an interest only in the company that constructed the project. They say that the words "In connection with the construction of the above proposed project, this is to advise that for your services as an officer of the company, which will construct this project, we will compensate you as follows: (1) We will issue to you 10% of the capital stock of the corporation . . ." and they contend that this language demonstrates that it was not intended that Irey should receive an interest in any corporation that did not do the construction work, and since Diller-Len was the company that did the construction work, plaintiff's claim cannot exceed 5 per cent of the contract fee of $15,000.

From the court's 34 findings of evidentiary matter we deduce that the court found that it was understood by Len and Irey that the work would have to be contracted for and performed in accordance with the Wherry Act (63 U.S.Stat. 570 et seq. [1949 C-403]); they did not know that in order to operate successfully under that act they would have to have two corporations; it was their belief when they entered into the original agreement that a single corporation would own the project and contract to perform the work; it was their understanding that Irey would receive a percentage of 10 per cent or 5 per cent, as the case might be, of whatever Len or Len Construction Company should receive as proceeds of the enterprise.

The agreement was interpreted as if the parties had contemplated the use of two corporations and intended that Irey should receive a percentage of the proceeds of the project derived by both corporations. This appears to us to be not only a reasonable interpretation of the agreement but, in fact, the only reasonable one. When it was believed that a single corporation would be both the owner of the project and the contractor, it was the clear intention of the parties that Irey would receive a percentage of the proceeds to be derived

from ownership of the lease and improvements. He has been awarded no more than this by the judgment.

The propriety of interpreting the contract as if it had incorporated pertinent provisions of the Wherry Act cannot be questioned. (Civ. Code, § 1656; *Brown* v. *Ferdon,* 5 Cal.2d 226 [54 P.2d 712].)

The court properly took into consideration the circumstances in which the contract was made and the matter to which it related. (Civ. Code, § 1647.) The court's interpretation renders the contract lawful, operative, definite, reasonable and capable of being carried into effect. (Civ. Code, § 1643.) Any other construction would have been unreasonable.

The joint venture agreement was ambiguous. In one context the words "construct" and "construction" might require the personal services of a contracting party; in another context they might mean only that a certain result be brought about. The words were used in various connections. In the articles of incorporation of Coral Rose, in all the dealings with government agencies, in the building loan agreement, in the mortgagor's certificate and in the specifications and proposals, Coral Rose was designated as the one to construct the improvement. Since it was the purpose of the parties to complete the project if it was awarded to defendants, it was proper for the court to interpret the word "construct" as if it had been followed by "or cause to be constructed," and to thus identify the owner corporation as the one in which Irey was to receive an interest. This interpretation was in favor of Irey, the promisee, as it should have been (Code Civ. Proc., § 1864).

Another bit of evidence was that in a deposition Len testified that in negotiating with Diller for distribution of the stock of Coral Rose, he informed Diller that he was obligated to turn over 5 per cent of the stock to Irey.

We agree with the trial court that if the parties had not intended for Irey to have an interest in Coral Rose, the owning corporation, they would have said so. To have read into the agreement that when two corporations were formed, as they had to be, Irey's interest would be only in the one that did the actual work of construction would have made an entirely different agreement for the parties.

In resolving the ambiguity of the contract the court received extrinsic evidence which bore directly upon the intentions of the parties. The case falls within the rule that a

reasonable interpretation reached by the trial court from a consideration of proper extrinsic evidence will not be disturbed on appeal. The interpretation is regarded as the decision of a question of fact. (*Walsh* v. *Walsh,* 18 Cal.2d 439 [116 P.2d 62].) However, we believe it is more satisfactory to all concerned for a reviewing court to be able to say it agrees with the trial court rather than to say that it is precluded by the rule from expressing disagreement.

No contention is made that Irey failed in any particular to render the services he had agreed to render. Neither is it contended that under the court's interpretation of the agreement the relief granted by the judgment is excessive.

A further contention advanced by defendants is that the action was barred by the statute of limitations. The action was upon a written contract entered into May 17, 1951. The present action was filed June 9, 1954. It was well within the four-year period for actions upon written contracts. (Code Civ. Proc., § 337.)

The judgment is against Sam Len and Len Construction Company. The agreement was signed Len Construction Company, by Sam Len, president. The court found that the corporation was the *alter ego* of Len and for that reason held Len personally liable. The finding that the two were not separate identities is claimed to be unsupported by the evidence, and it is also contended that in any event the present case would not be a proper one for application of the doctrine of *alter ego.* We are unable to agree with either of these contentions. The only stock issued by this corporation was the 500 shares that were issued to Len. He had the complete ownership, management and control of the corporation. Len testified that he owned 100 per cent of the stock of Len Construction Company and of the corporation he said ''I mean actually it is all the same—I mean as far as I am concerned. It is the right hand, the left hand, it is all the same.'' When asked whether he would assume personal responsibility for the obligations of the corporation he replied ''We always have in the past for bonds, everything else. We co-signed the two entities as one, actually.'' As the trial court remarked ''The corporation was a mere shell not to be distinguished from Len himself.''

If the contentions of defendants had prevailed, Irey would have been awarded at most $750 and a 5 per cent interest in a corporation that had no interest in the project

and had received from it no money. It would have accomplished a manifest injustice.

A further contention is that in entering into the contract Irey was acting as a business opportunity broker or salesman as defined by the Business and Professions Code and that he was not licensed in either capacity as required by sections 10252 and 10253 of the code. The point does not require discussion. Irey's services were rendered as an officer of the corporation with respect to the corporation's own property and he was not required to be licensed to render such services. (Bus. & Prof. Code, § 10254, subd. (a).) Moreover, one who, having an interest in a proposed joint venture, merely assists in interesting others in it, and renders services to it after it is formed, acts as neither a broker nor salesman.

The judgment is affirmed.

Vallée, J., and Ford, J., concurred.

A petition for a rehearing was denied May 3, 1961, and appellants' petition for a hearing by the Supreme Court was denied May 31, 1961.