[No. A011984. First Dist., Div. Four. Aug. 26, 1986.]

MITCHEL L. MITCHELL, Plaintiff, Cross-defendant and Appellant, v.
EXHIBITION FOODS, INC., et al.,
Defendants, Cross-complainants and Respondents.

1034

COUNSEL

Thelen, Marrin, Johnson & Bridges, Ronald F. Sullivan and Wynn S. Carvill for Plaintiff, Cross-defendant, and Appellant.

Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, and Harvey L. Gould for Defendants, Cross-complainants and Respondents.

OPINION

**SABRAW, J.**—The major issue on this appeal by plaintiff Mitchel L. Mitchell from a judgment requiring him to execute a new lease of real

property to defendants Exhibition Foods, Inc., and Jax Steak House—San Francisco, Inc., is the construction of a "first right of refusal" provision in the antecedent lease between the parties.

I

The original lease executed in February of 1968 concerned a parcel of improved real property located in downtown San Francisco. The lease, whose term would end on January 31, 1979, was thereafter amended in two pertinent particulars. First, Exhibition Foods, the original lessee, assigned "all of its right, title and interest" in the lease to Jax Steak House. Plaintiff consented to this substitution, subject to the provision that "Exhibition Foods . . . shall assume all responsibility under the terms of the . . . lease agreement in the event of default by Jax Steak House."[1] Second, the lease was modified to include the "first right of refusal" provision. As relevant here, it reads as follows: "Right to lease for an additional period. Lessee shall have the first right of refusal to lease for an additional five years under the following conditions: . . . [¶] At any time during the tenth year of the lease term, the Lessor may present a bona fide lease offer from others to the Lessee and the Lessee shall have forty-eight hours in which to elect in writing to lease on terms and conditions contained in said other[] offer. If Lessee elects not to lease, then Lessor shall thereafter be free to lease the premises to others."

Defendants thereafter entered into possession of the premises and began installing a number of improvements, among which were a forced air ventilation system, piping, a sprinkler system, hot water heaters, restrooms, a basement office, a freight elevator, a dumbwaiter, walk-in freezers, and a new electrical system. The cost to defendants of these improvements was approximately $200,000. Commencing in February of 1969, defendants operated a restaurant on the premises. A display grill used in preparing food was prominently visible to pedestrians, as was a distinctive exterior sign. In October of 1974, after receiving indications that plaintiff would be agreeable to extending the term of the lease, defendants spent about $12,000 repainting the interior and exterior of the premises.

In about December of 1977, plaintiff began negotiating a possible lease of the premises to Alexander Kindler. A formal and detailed offer was

---

[1] Because this provision had the effect of making Exhibition Foods and Jax Steak House—both of whose capital shares are owned entirely by Herman Likerman, the president of both corporations, and his wife—joint obligors on the lease, there seems to be little point in differentiating between and making separate reference to each defendant. Except in instances where it is appropriate to mention only one, we shall hereinafter refer to them both as "defendants."

reduced to writing and submitted by Kindler to plaintiff in May of the following year. The "Use of Premises" provision recites Kindler's intention to establish a "food market" after the ground floor is "subdivided and subleased" to a described variety of food-related retailers. Kindler would pay a monthly rent of $4,750 "[f]or a term of five (5) years." The critical provision of the Kindler offer concerned extensions of this term. As pertinent here, it provided in relevant part: "9) Option: Lessor shall grant the Lessee the right to extend this lease to the demised premises for three (3) consecutive periods of five (5) years[,] each commencing at the termination of the original five year lease, said extensions shall be subject to all of the terms and conditions contained in the original lease except as to a further option to extend the term thereof . . . ." Kindler's offer also included an acknowledgment of "the right of the present tenant (Jax) to match this offer to lease the premises for five (5) years."

On May 24, 1978, plaintiff executed a written acceptance of Kindler's offer, which was accompanied by a receipt for a check in the amount of $4,750. Plaintiff presented the offer to defendants' president Herman Likerman (see fn. 1, *ante*) on the same day. Within the approved period for acceptance, Likerman dispatched to plaintiff a letter which read as follows:

"Exhibition Foods, Inc., dba Jax Steak House, hereby accepts the conditions of the offer that you have received from Alexandre [*sic*] Kindler, but wishes to call to your attention one aspect of the Kindler offer which is inapplicable to its tenancy.

"Paragraph 8 of said offer would not apply, since exterior signs already exist under the present tenancy, and have been previously approved. Accordingly, those exterior signs presently in existence could remain . . . . I trust . . . that the offer would be established as being a bona fide one. Based on that presumption, and subject to the further condition noted respecting paragraph 8 of the offer, Jax hereby accepts the conditions of the Kindler offer."

Plaintiff thereafter submitted a proposed lease for Likerman's signature. The details of the lease need not be recounted here: it suffices to characterize it as incorporating various provisions from the Kindler offer which defendants deemed disadvantageous (i.e., paragraph 8) while omitting others (especially paragraph 9) which defendants considered beneficial. Likerman sent plaintiff a letter advising him of these "deficiencies," together with the proposed lease as interlineated with "proposed modifications." Plaintiff responded with a letter in which he in essence told Likerman to "execute

this new lease" or "I shall proceed with the necessary legal action."[2] Likerman did not comply with the former directive, whereupon plaintiff commenced this action.

The case was tried in two phases. Plaintiff's complaint for unlawful detainer was submitted to a jury, which heard testimony from plaintiff, Kindler, Likerman, and an expert real estate appraiser. The jury returned a general verdict in favor of defendants. The equitable issues framed by defendants' "Cross-Complaint for Specific Performance, Declaratory Relief and Injunctive Relief" were then decided by the trial court on the additional basis of briefs and argument. The court filed findings of fact and conclusions of law to the general effect that there did exist a new lease between the parties which incorporated some provisions of the Kindler offer (most particularly paragraph 9) and excluded others (e.g., paragraph 8, dealing with the matter of signs).[3] Defendants were awarded attorneys' fees, based upon

---

[2]Because this letter was a harbinger of plaintiff's subsequent position both at trial and on this appeal, it warrants being quoted at length. In the body of his letter plaintiff stated:

"This is in response to your letter dated June 20, 1978, regarding a new lease for your business at 171 O'Farrell Street.

"*First of all you must realize that you are entitled to have a lease limited to a five (5)* year term as has been agreed in the letter of agreement dated February 9, 1968 [which embodied the right of refusal provision], wherein it is also provided that you agree to certain conditions.

"The Kindler offer, being a new and different type of business, is for a longer period and the additional conditions have no bearing on our agreement of February 9th, 1968.

"The other conditions in the Kindler offer are for Kindler's lease. The conditions in the lease agreement that I prepared for you shall remain the same and for your execution.

"You have full knowledge of our agreement which restricts you to a new lease with a five year term and there is no need of devoting time to correspondence over matters that do not exist.

"If I should not have the lease agreement signed by you within the next few days, then in such an event I shall proceed with the necessary legal action to have you execute this new lease or to have your old one terminated on the last day of January 1979, being the termination date in accordance to [*sic*: with] our original lease agreement."

[3]The trial court's dispositive determinations regarding the lease were embodied in a series of conclusions of law. With minor editorial changes, we quote them in pertinent part as follows:

"1. A lease does exist between the landlord [plaintiff] and the cross-complainants [defendants] relative to the subject premises. . . .

"2. By virtue of the right of first refusal in the 1968 lease, the tenant has the right to continue his same business if it exercised its right thereunder. Terms in the offer from a third party which were inconsistent with the continuity of the present tenant's business are not part of the new lease between the landlord and his tenant. Terms in the offer from a third party which are not inconsistent with the continuity of the present tenant's business are a part of the new lease between the landlord and his tenant.

". . . . . . . . . . . . . . . . . . . .

"4. The terms of the new lease is for a period of five (5) years.

"5. The right of first refusal does not exclude the possibility of additionally giving to the tenant renewal options if such options are part of a third party offer for the rental of the premises. The right of first refusal obligates the landlord to offer his existing tenant terms and conditions having an economic equality to those the landlord is willing to accept from

provisions of the original and the new leases, for both phases of the trial. The court thereafter entered a judgment directing plaintiff to prepare a new lease with specified provisions and to submit it to defendants for execution.

This timely appeal followed.

REVIEW

II

Plaintiff's attack on the judgment is not total. He does not dispute the verdict on his unlawful detainer complaint. Nor does he contest that part of the judgment in which the trial court declared the existence of a new lease between the parties for a term of five years. (See conclusions of law Nos. 4 and 12 quoted in fn. 3, *ante.*) He does, however, challenge the inclusion of the three 5-year extensions derived from paragraph 9 of the Kindler offer.

██ Much of plaintiff's challenge is devoted to his construction of the first right of refusal provision. Neither side presented evidence at the trial on the issue of the parties' intentions regarding the provision at the time of its negotiation and execution. We are therefore not required to accept the trial court's interpretation of the agreement; instead, it is this court's function to make an independent determination of the provision's meaning. (See *Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 [204 Cal.Rptr. 435, 682 P.2d 1100]; *State of California* v. *San Luis Obispo Sportsman's Assn.* (1978) 22 Cal.3d 440, 451 [149 Cal.Rptr. 482, 584 P.2d 1088]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Hudson Properties Co.* v. *Governing Board* (1985) 168 Cal.App.3d 63, 71 [213 Cal.Rptr. 909]; *Rollins* v. *Stokes* (1981) 123 Cal.App.3d 701, 709 [176 Cal.Rptr. 835].) We now examine the various arguments pressed by plaintiff.

---

a third party. Paragraph 9 of the Kindler offer provides for a right of three five (5) year renewals of the lease. Since said paragraph is a condition of the Kindler offer and since under their right of first refusal the cross-complainants are entitled to the terms and conditions of a bona fide third party offer and since failure to extend that right to his tenant would mean the landlord would not be extending to his tenant conditions of economic equality with those he was willing to accept from a third party, Paragraph 9 is a part of the new lease.

"............................................

"12. The new lease for the subject premises is for a five (5) year term commencing on the 1st day of February, 1979 to and including the 31st day of January, 1984 at a monthly rental of Four Thousand Seven Hundred Fifty ($4,750.00) Dollars per month for the subject premises presently occupied by Jax Steak House."

## A

The first wave of plaintiff's assault on the judgment pertains to the interpretation of the first right of refusal provision. Although stated in differing ways, it boils down to a single simple proposition: the provision expressly limits an extension of defendant's tenure to "an additional five years," a restriction which cannot be ignored but must be respected. This is the same argument plaintiff has asserted from the start of his dispute with defendants. (See fn. 2, *ante*.) We turn to some of the rules governing contract interpretation to assist our resolution of this argument.

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.)[4] "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (§ 1638.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible. . . ." (§ 1639.) As previously mentioned, no extrinsic evidence regarding the parties' intentions was introduced at trial. Our analysis is consequently confined to the words of the provision and whatever general principles of law are applicable.

The first sentence of the provision—"Lessee shall have the first right of refusal to lease for an additional five years"—seems to support plaintiff's construction. But our inquiry does not end here. Mindful of the rule of interpretation that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other" (§ 1641), note must be taken of that part of the provision which gave defendant the rights "to lease on terms and conditions contained in" the third party offer acceptable to plaintiff. Defendants contend that this language clearly entitles them to the benefits of paragraph 9 of the Kindler offer, which plaintiff had already accepted.

Each of these opposing constructions draws support from the language of the first right of refusal provision. Neither is incompatible with the provision, whose express language does not compel the adoption of either. The upshot is an apparent stalemate resulting from an arguably ambiguous contractual provision. Ordinarily, such an ambiguity might be resolved with the aid of extrinsic evidence. But as previously mentioned, no such evidence was introduced by the parties. Thus, we have a deadlock which cannot be broken by reference to the express language of the provision, or by appli-

---

[4]Statutory references are to the Civil Code unless otherwise indicated.

cation of the general rules governing the interpretation of contracts. (§§ 1635-1656.)

■ Defendants urge that we break this impasse by invoking the rule that "uncertainties in agreements to renew leases are to be construed in favor of the tenant." Although there are decisions to this effect (see, e.g., *McAulay* v. *Jones* (1952) 110 Cal.App.2d 302, 306 [242 P.2d 650]; *Erickson* v. *Boothe* (1947) 79 Cal.App.2d 266, 272 [179 P.2d 611]), they appear to state a particularized variant of the familiar principle that ambiguities and uncertainties are to be construed against the party who created them in drafting the contract. (§ 1654; *Taylor* v. *J. B. Hill Co.* (1948) 31 Cal.2d 373, 374 [189 P.2d 258]; *Heston* v. *Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 415 [206 Cal.Rptr. 585]; *Jacobs* v. *Freeman* (1980) 104 Cal.App.3d 177, 189 [163 Cal.Rptr. 680].) The trial court made an express finding that the first right of refusal provision "was the product of a joint drafting effort by the parties" (finding of fact No. 4). Neither plaintiff nor defendants challenge this determination. The parties thus stand on an equal footing. There is consequently no basis for applying the principle of *contra proferentem* as defendants suggest. (Cf. *Simons* v. *Young* (1979) 93 Cal.App.3d 170, 180-181 [155 Cal.Rptr. 460]; *McClintick* v. *Leonards* (1930) 103 Cal.App. 768, 773-774 [285 P. 351].)

■ Nor can we accede to plaintiff's urging that section 1649 will break the logjam. That statute provides: "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." The utility of this canon of construction is defeated by the evidentiary void, because there is no alternate means of ascertaining plaintiff's belief as to defendants' state of mind ten years past. (See §§ 1636, 1637.)

But if the ordinary rules of contract interpretation are of scant help in maneuvering out of this constructional *cul-de-sac,* a more decisive assist is provided by one of the less familiar canons of construction. Code of Civil Procedure section 1864 provides: "When the terms of an agreement have been intended in a different sense by the different parties to it, that sense is to prevail against either party in which he supposed the other understood it, and *when different constructions of a provision are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made.*" (Italics added.) The first part of this statute is not germane because of the dearth of evidence concerning the parties' intentions in drafting the right of refusal provision. The second part, however, seems ideally suited for application in these circumstances.

There can be no doubt that the first right of refusal provision is of greater benefit to defendants than to plaintiff. Defendants are ensured a preference

in leasing the premises if they want it. By contrast, plaintiff was obliged to negotiate the terms of a new lease with a stranger and then, while holding the third party's offer in limbo, offer the new lease to defendants with no assurance that they would accept it. The balance of burdens as opposed to rewards clearly inures to defendants' advantage. The provision, by providing for their security of tenure, is clearly intended to be for the benefit and protection of defendants. (See *Re* v. *Wells Fargo Bank* (1969) 269 Cal.App.2d 783, 786 [75 Cal.Rptr. 367].) They are therefore "the party in whose favor the provision was made" within the meaning of Code of Civil Procedure section 1864. (See *Irey* v. *Len* (1961) 191 Cal.App.2d 13, 18 [12 Cal.Rptr. 403]; *Keller* v. *Hiers* (1951) 108 Cal.App.2d 424, 427 [239 P.2d 6]; *Pappadatos* v. *Market Street Bldg. Corp.* (1933) 130 Cal.App. 62, 65 [19 P.2d 517].)

A second factor in breaking the internal interpretational impasse is a general principle of law which commands increasing prominence. ■ "It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing. [Citations.] Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement." (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158] [original italics].) In addition to this principal function, the covenant has a subsidiary use for the parties' predicament. "In the case of a contradictory and ambiguous contract, . . . the implied covenant may be applied to aid in construction." (*April Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805, 816 [195 Cal.Rptr. 421].)

■ The scope of the covenant of good faith derives substance from its contextual setting. "The precise nature and extent of the duty imposed . . . will depend on the contractual purposes." (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]; accord *Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 705 [201 Cal.Rptr. 528]; *National Life & Accident Ins. Co.* v. *Edwards* (1981) 119 Cal.App.3d 326, 339 [174 Cal.Rptr. 31].) One of the covenant's components which has been established in the field of commercial leases is a duty on the part of a landlord to promote the continued use and occupancy of the premises by an existing tenant. (See *Lippman* v. *Sears, Roebuck & Co.* (1955) 44 Cal.2d 136, 142-143 [280 P.2d 775]; *Cordonier* v. *Central Shopping Plaza Associates* (1978) 82 Cal.App.3d 991, 999-1000 [147 Cal.Rptr. 558]; cf. *Edmond's of Fresno* v. *MacDonald Group, Ltd.* (1985) 171 Cal.App.3d 598 [217 Cal.Rptr. 375].) ■ It was this particular aspect of the good faith requirement which the trial court had in mind when it referred to "the continuity of the present tenant's business." (See conclusion of law No. 2 quoted in fn. 3, *ante.*)

The obvious purpose of the first right of refusal provision was to ensure defendants an opportunity to extend the lease with plaintiff. The provision vested plaintiff with discretion to negotiate a lease with a third party, but this discretion had to be exercised in good faith and in accordance with the principles of fair dealing. (*Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785, 49 A.L.R.2d 496]; *Mission Ins. Group, Inc.* v. *Merco Construction Engineers, Inc.* (1983) 147 Cal.App.3d 1059, 1065 [195 Cal.Rptr. 781]; see *Jacobs* v. *Freeman, supra,* 104 Cal.App.3d 177 at p. 190.) Given that plaintiff and defendants had an arm's length business relationship, the provision did not convert plaintiff into defendants' altruistic agent with anything like a fiduciary duty to safeguard their interests. But if plaintiff did not have to protect defendants' interests, he was at least required to keep them in mind. In light of past conversations, plaintiff knew or should have known that defendants desired to continue their tenancy. Moreover, the provision itself, a separately negotiated part of the original lease, evidenced their strong inclination to remain in possession of the premises and continue their existing use. Plaintiff could not be oblivious to these impulses, nor could he completely disregard them.

Plaintiff negotiated a lease with Kindler which could have permitted the latter a tenancy of up to 20 years. His refusal to extend the same to defendants was inconsistent with his contractual agreement to offer defendants an opportunity "to lease on terms and conditions contained in [the third party] offer." If successful, this would deprive defendants of "the benefits of the agreement," contrary to the covenant of good faith and fair dealing. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752 at p. 768.) In addition, and as the trial court concluded, affording defendants the full measure of paragraph 9 of the Kindler offer is not excluded by the express language of the first right of refusal provision. (See conclusion of law No. 5 quoted in fn. 3, *ante.*) Furthermore, this construction accords with the rule specified in Code of Civil Procedure section 1864.

Upon an independent examination of the agreement and the record, each and all of these considerations convince us that the trial court's interpretation of the first right of refusal provision was correct. We therefore sustain that interpretation and reject plaintiff's argument to the contrary. (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d 861, 866; *Re* v. *Wells Fargo Bank, supra,* 269 Cal.App.2d 783, 786.)

### B

As previously mentioned, the trial court declared the existence of a new lease which incorporated some provisions of the Kindler offer while omitting others because they would be "inconsistent with the continuity of the present

tenant's business." (See fn. 3 and accompanying text, *ante*.) ▆▆▆ Plaintiff contends in effect that this selective blue pencilling amounted to rewriting the Kindler offer into an "inequitable" lease which he was compelled to execute.

The Kindler offer was embodied in a letter which sets forth 14 numbered paragraphs beneath the heading "Special Conditions."[5] The first seven paragraphs, dealing with such matters as calculating increases of the monthly rent, payment of taxes, insurance, and a "leasehold deposit" of $5,000, were ordered included in the new lease by the trial court. Also included were provisions concerning the "option" renewals ([¶] 9, quoted *ante*) and assignment ([¶] 11). Not included by common consent were the provisions regarding exterior signs ([¶] 8) and acknowledgment of defendants' "right to match this offer" ([¶] 14). Excluded were the "use of premises" provision ([¶] 10) already described; a provision for modification of the building's entrance ([¶] 12), which would have required removal of defendants' display grill; and a provision for a two-month "free rent" period "for the purpose of making the necessary repairs, alterations and improvements" ([¶] 13).

Plaintiff appears to argue that the Kindler offer was an integrated unit which defendants and the trial court had to accept or reject in its entirety. This argument is plausible on its face, but it overlooks two salient considerations.

The first defect in plaintiff's argument is that it has no appreciation of its potential for oppression. Suppose that the best offer plaintiff could obtain envisaged a radical change in the use to which the premises would be devoted. Or consider a malevolent lessor, intent on ridding himself of an unwanted tenant, who purposely limits his search for new tenants to only those planning a completely different use of the property. For purposes of illustrating either situation, what if Kindler had contemplated operating a foundry or a sawmill. Does plaintiff seriously contend that the only effect of the refusal provision is that he then advise defendants "You can remain as my tenant provided you too will operate a sawmill?" The possibilities for abuse of the lessor's discretionary power amounting to oppression are obvious. (Cf. *Nelson* v. *Reisner* (1958) 51 Cal.2d 161, 169-170 [331 P.2d 17].) We cannot accept that the inevitable consequence of a provision intended for a lessee's protection (see *Re* v. *Wells Fargo Bank, supra,* 269 Cal.App.2d 783, 786) may

---

[5]As may be surmised from this caption, the letter did not include all of the provisions intended for incorporation in the final version of the lease. Both of the lease versions which plaintiff submitted to Kindler and to defendants included three pages of a standardized commercial lease form to which typewritten provisions of the Kindler offer were either inserted or appended.

be to provide a lessor unbridled and unconscionable power to solicit and accept an offer so conspicuously lacking in commercial reasonability that it appears meant to induce a rejection by the lessee as a pretext for eviction. (See 1A Corbin on Contracts (1963) § 261, p. 477 ["The law will require performance 'in good faith' and the term 'offer' will be interpreted as denoting one that is not beyond the bounds of commercial reason and practice and made for the purpose of inducing a rejection."].)

The second problem with plaintiff's argument is that it fails to take account of the covenant of good faith and fair dealing. The contours and obligations of the covenant may be nebulous, but its essence was immediately appreciated and innovatively applied by the trial court. What the court did was treat the Kindler offer as furnishing the framework for a new lease between plaintiff and defendants. Most of the essential elements of the lease—identification of the parties, a precise description of the premises, and an express agreement to pay a specified rental at designated intervals (see *O'Shea* v. *Claude C. Wood Co.* (1979) 97 Cal.App.3d 903, 909-910 [159 Cal.Rptr. 125])—were easily ascertainable from the modified version of the Kindler offer which plaintiff submitted to defendants. Once the length of the new lease's duration had been determined (again, using the Kindler offer itself), the trial court avoided the first problem with the contention plaintiff now makes by requiring that the terms of the Kindler offer be adapted in such a way as not to injure, frustrate, or make impossible defendants' continuing their existing use of the property. This creative procedure harmonized (1) a recognition that plaintiff's discretion to negotiate with third parties gave him the dominant role in establishing the terms of a new lease, with (2) a sensitive awareness of the disadvantages thereby imposed on defendants.

It ill behooves plaintiff to challenge the trial court's process of selective inclusion and exclusion. Plaintiff himself deleted paragraphs 9, 10, 11, 12, and 13 from the proposed lease which he submitted to defendants. The trial court incorporated some of these provisions and deleted others according to the consistently applied principle of omitting only provisions which were inimical to defendants' existing use. In light of plaintiff's own earlier failure to treat the provisions of the Kindler offer on an "all or nothing" basis, the trial court's doing likewise was warranted. (See *Crestview Cemetery Assn.* v. *Dieden* (1960) 54 Cal.2d 744, 752-754 [8 Cal.Rptr. 427, 356 P.2d 171]; *Zalk* v. *General Exploration Co.* (1980) 105 Cal.App.3d 786, 794 [164 Cal.Rptr. 647]; *Kuffel* v. *Seaside Oil Co.* (1970) 11 Cal.App.3d 354, 369 [90 Cal.Rptr. 209].)

The trial court, wielding what Lord Bacon called its "praetorian power for equity," carefully crafted a result that is in accordance with the highest

principles of good faith, the demands of commercial reasonability, and the contractual provisions. (See *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 768; *Nelson* v. *Reisner, supra,* 51 Cal.2d 161 at pp. 165-170; *Re* v. *Wells Fargo Bank, supra,* 269 Cal.App.2d 783 at p. 786; 1A Corbin on Contracts, *supra,* § 261, p. 477.) In no sense can that result be called inequitable.

## C

■ Plaintiff next contends that the trial court's construction of the first right of refusal provision makes it "unenforceable in equity." It is true that equity will not order specific performance of "[a]n agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable." (§ 3390, subd. 5.) This requirement does not, however, preclude enforcement of agreements which have some degree of uncertainty. "Equity does not require that all the terms and conditions of the proposed agreement be set forth in the contract." (*King* v. *Stanley* (1948) 32 Cal.2d 584, 588 [197 P.2d 321]; accord *Hutton* v. *Gliksberg* (1982) 128 Cal.App.3d 240, 245 [180 Cal.Rptr. 141].) The discussion in the preceding sections of this opinion established that the trial court correctly construed the first right of refusal provision, and that thereafter the essential elements of a lease were readily ascertainable. Once the question of the applicability of paragraph 9 of the Kindler offer had been resolved, the remaining non-essential paragraphs of the Kindler offer were within the trial court's authority to settle. (See *City of Los Angeles* v. *Superior Court* (1959) 51 Cal.2d 423, 433 [333 P.2d 745]; *Mabee* v. *Nurseryland Garden Centers, Inc.* (1978) 84 Cal.App.3d 968, 972 [149 Cal.Rptr. 105]; cf. *Ablett* v. *Clauson* (1954) 43 Cal.2d 280, 285-286 [272 P.2d 753].) Plaintiff's final challenge to the judgment regarding the first right of refusal provision fails accordingly.

## III

■ One of the provisions in the standardized form which plaintiff submitted to defendants in conjunction with the Kindler offer (see fn. 5, *ante*) read as follows: "In case Lessor shall bring suit to recover any rent due hereunder or for breach of any covenant of this lease, or to recover possession of the premises, and shall recover in the suit, or if Lessee shall bring any action for any relief, declaratory or otherwise, arising out of this lease, and Lessor shall prevail in such action, Lessee agrees to pay Lessor a reasonable attorney's fees which shall be taxed by the court as part of the costs of such action." The trial court concluded that defendants "are entitled to recover their attorney's fees as prevailing parties in the prosecution of their cross-complaint, which was for declaratory and other relief, pursuant

to the provisions of the new lease" (conclusion of law No. 15).[6] Plaintiff contends that this determination was erroneous because "the attorneys' fees clause in the new lease is inapplicable to the cross-complaint" in that the dispute between the parties concerned the original lease and therefore was not one "arising out of this [the new] lease." We do not agree.

Plaintiff's argument possesses an arguable attractiveness, but its substance dissipates upon examination. The plausibility of the argument stems from the fact that the controversy between plaintiff and defendants implicates both leases. Certainly the origin of the dispute was the right of refusal provision in the first lease, and to that extent the litigation did not "arise out" of the second lease. But the ultimate issue was what were the precise terms to be included in the second lease if defendants had properly exercised their right to match Kindler's offer. Plaintiff conceded that the moral authority of the jury's verdict settled the issue of whether there was a lease. There was no genuine dispute that if there was a new lease, the attorney's fee provision was a part of it.

The trial court declared that a contract had been made (see conclusion of law Nos. 1 and 12 quoted in fn. 3, *ante*), a determination which plaintiff does not dispute. ▉▉▉ The fact that this contract was not formalized in a writing signed by both sides has no bearing on the existence or validity of that contract.[7] (See *Gavina* v. *Smith* (1944) 25 Cal.2d 501, 504 [154 P.2d 681]; *Stephan* v. *Maloof* (1969) 274 Cal.App.2d 843, 848 [79 Cal.Rptr. 461]; *Norcross* v. *Winters* (1962) 209 Cal.App.2d 207, 221 [25 Cal.Rptr. 821]; 1 Corbin on Contracts, *supra*, § 30.) **(9b)** We agree completely with the trial court that defendants' cross-complaint qualified within the meaning of the contractual language as "an[] action for any relief, declaratory or otherwise, arising out of this lease," thereby entitling them to an award of attorneys' fees. (§ 1717; *Nasser* v. *Superior Court* (1984) 156 Cal.App.3d 52 [202 Cal.Rptr. 552]; *Mackinder* v. *OSCA Development Co.* (1984) 151 Cal.App.3d 728, 738-739 [198 Cal.Rptr. 864]; *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 494-495 [186 Cal.Rptr. 114, 38 A.L.R.4th 1].)[8]

---

[6]The actual fees awarded pursuant to this provision amounted to $4,106, which was one-third of defendants' total attorneys' fees. The remaining two-thirds of defendants' fees were allocated to their defense against plaintiff's complaint for unlawful detainer. This latter award was made pursuant to a provision in the original lease which read:

"In case suit shall be brought for an unlawful detainer of the said premises, for the recovery of any rent due under the provisions of this lease, or because of the breach of any other covenant herein contained, on the part of Lessee to be kept or performed, Lessee shall pay to Lessor a reasonable attorney's fee which shall be fixed by the court."

[7]At no time has plaintiff claimed a problem with the statute of frauds (§ 1624, subd. 4).

[8]Plaintiff also contends that the award of attorneys' fees on the cross-complaint is not authorized by the attorneys' fees provision in the original lease (quoted in fn. 6, *ante*). We refuse to address this argument because this provision was not the basis for the trial court's award.

Defendants contend that the provision also entitles them to an additional award of attorneys' fees incurred in resisting plaintiff's appeal. This is correct. (*Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 637 [186 Cal.Rptr. 754, 652 P.2d 985]; *Wilson* v. *Wilson* (1960) 54 Cal.2d 264, 272 [5 Cal.Rptr. 317, 352 P.2d 725].) The amount of the additional award may be fixed by the trial court when it determines defendants' costs on appeal. (Code Civ. Proc., § 1034; *Genis* v. *Krasne* (1956) 47 Cal.2d 241, 248 [302 P.2d 289]; *Western Camps, Inc.* v. *Riverway Ranch Enterprises* (1977) 70 Cal.App.3d 714, 730 [138 Cal.Rptr. 918].)

The judgment is affirmed.

Poché, Acting P. J., and Channell, J., concurred.

A petition for a rehearing was denied September 24, 1986.